# EXPERT REPORT OF
# LOUIS G. FEY JR, CPCU, CIC, AIC

---

**ADDRESS:** Home: 2136 N Woodchase Ct., Baton Rouge, LA 70808     (225) 362-3919
Office: 4041 Essen Lane, Ste. 400, Baton Rouge, LA 70809     (225) 336-3211

Occupation:
Risk Management Consultant, Insurance Underwriting, Insurance Claims consulting, coverage analysis, contract review.

Field of Expertise:
Insurance claims adjustment, defense consulting, policy placement, underwriting, policy drafting (as to manuscript policies), coverage analysis and review.

---

## Definitions Used in this Report

1. **"LANDMARK" or "Insurer"** shall refer to **LANDMARK AMERICAN INSURANCE COMPANY**, ("Landmark" or "Insurer").

2. **"Insurance Policy"** shall refer to the contract for insurance issued by Landmark issued to Plaintiff referred to in the Complaint, being designated by Landmark to be Policy Number: LHD349059 renewal of LHD343088.

3. **"Prior Insurance Policy"**

4. **"Proofs of Loss" or "Sworn Statements in Proof of Loss"** shall refer to the Sworn Statements in Proof of Loss, attached as Exhibit 2 to the Complaint.

5. **"Statement of Loss"** shall refer to the document attached as Exhibit 1 to the March 26, 2009 letter from C. Thomas Brown to Gene Adami, which letter and its attachments are attached as Exhibit 4 to the Complaint.

6. **"Claim"** shall refer to the claim made by Plaintiff on Landmark related to the July 19, 2007 Loss as set forth in the Complaint. Claim shall include all aspects of the claim made against Landmark.

7. **"Contract" or "Agreement"** shall mean the Policy of insurance referred to in the Complaint.

8. **"Plaintiff" or "Insured"** shall mean **DAVCO RESTAURANTS, INC.**

9. **"Deductible Endorsement"** shall mean the deductible endorsement no. 1 attached to the Policy.

1

10. **"Annual aggregate retention"** shall mean that term as used in the Deductible Endorsement.

DATE OF REPORT: _____September 28, 2009_____

1.1 I will act as an expert witness. I have been retained by DavCo to assist in their investigation into matters relating to a Fire loss and a claim made under a policy of insurance for the above Insured. I offer this report in compliance wit F.R.C.P. 26(a)(2)(B).

1.2 I have been provided with a copy of Federal Rule of Civil Procedure 26(a)(2)(B) which I have read and which I understand.

1.3 Within the body of this report, I may refer to above terms.

1.4 I have been asked based upon my investigation and with the benefit of my qualification and expertise whether I have certain opinions as more fully set out below. Where I do, in fact, have such an opinion or opinions, I state what the opinion(s) is and explain the basis for that opinion(s). Where such an opinion is stated, it is provided based upon my personal knowledge of the event in question, information provided to me which I consider to be reliable and which is the type of information reasonably relied upon by one in my profession or I was otherwise asked to assume. Where I have been asked to assume information, I have done so only where I consider the assumption requested to be reasonable under the circumstances. All of my opinions set forth herein are given to a reasonable degree of certainty based upon that standard which applies in the property insurance industry.

2. **Opinion Sought**

   2.1 **What are your qualifications in the field of insurance:**

   B.B.A. Bachelors of Business Administration – University of Cincinnati
   Certificate in General Insurance - INS
   Associate in Claims - AIC
   Chartered Property Casualty Underwriter - CPCU
   Certified Insurance Counselor – CIC
   Licensed adjuster
   Licensed Property Casualty Producer
   Licensed Life & Health Producer

2

28 years of practical experience handling complex property casualty claims including complex property losses.

Each designation is the result of countless hours of study and classroom participation. For example, the Chartered Property and Casualty Underwriter designation is awarded upon completion of 10 courses of study covering every facet of the property casualty insurance industry. The classes are deemed worthy of credit in master's degree programs from many universities and are very comprehensive. The Certified Insurance Counselor designation is a five year program encompassing very technically advanced studies of Commercial Property Insurance coverage as well as other subjects. The Associate in Claims designation is a multi year program whose courses includes Commercial Lines Property coverage and claim handling.

I have given numerous seminars on insurance coverage and related issues as outlined on my CV. I assisted in authoring the Claims Manual for Ohio Casualty's Claim Department in the mid 1980's. I am a former member of the N.A.I.I.A. National Advisory Council (NAC) (an industry think tank). I currently serve as a member of Chartis Insurance Companies (formerly AIG) claim advisory counsel.

In my current position at BancorpSouth Insurance Services I act as a liaison between our clients and insurance companies and or their coverage or defense counsel to advise and assist with regard to insurance coverage issues, improper denials and other claim issues including but not limited to the proper application of deductibles in claim scenarios.

My opinions are based on a broad spectrum of education, experience and research. I have access to various industry resources such as Sage, Silver Plume and IRMI, I research case law, industry writings, multiple text books and apply actual practical property claim handling experience and practice.

### 2.2 What are your areas of expertise?

As applicable to this litigation; my area of expertise is common usage and practice in adjusting property losses. Specifically the application and meaning of terms deductible, retention as well as the common usage of the term annual aggregate retention, occurrence, loss, and claim. I will also testify with regard to the proper procedure and application of the deductible and retention to the claim at issue, based upon common standards, application and practice in the industry.

### 2.3 What is the basis of your Opinions?

In rendering my opinion, I have relied upon my experience and training in the industry. I have also relied upon my research in Sage, Silver Plume, IRMI, case law, industry writings and multiple text books. I have reviewed all documents related to this case as set forth below:

3

a. Package of Documents from Goodman Gable Gould having the following sub parts:

1. Schedule of Loss Agreements

2. Building and Debris Removal Claim

3. Building Loss Agreements

4. Business Personal Property Claim

5. Business Personal property Loss Agreement

6. EDP Claim

7. EDP Loss Agreement

8. Income Loss Claim

9. Final Evaluation Loss Evaluation

b. Policy covering period 10-1-05 to 10-1-06 along with endorsement No. 1 to policy

c. Confirmation of Property Insurance by NAPCO (broker)

d. Policy covering period 10-1-06 to 10-1-07 (covers fire in question)

e. 2 page statement of loss Prepared by Gene Adami showing a recommended ACV Bldg/Demo Payment of $311,359.50 still due and owed.

f. Copy of complaint

g. Copy of answer

h. March 26, 2009 letter from Silver and Brown to Gene Adami (adjuster for landmark)

i. April 7, 2009 letter from Gene Adami in response

I was requested to render these opinions as to whether the statement of loss prepared by Landmark's adjuster Gene Adami (item e above) was the proper method of applying the loss to the figures. I have been requested to assume that the insured and insurer have an agreement on all of the following numbers where the left column represents the actual loss sustained, and the right column represents the limit of coverage under the applicable policy:

|  | Amount of Loss | Policy Limit |
|---|---|---|
| **Debris Removal (Bldg) ($34,795.74)** | | |
| **Debris Removal (Bus. Pers. Prop)($10,000)** | | |
|     **Amount of Loss** | **$44,795.00** | |
|         **Policy Limit** | | $44,795.00 |
| **Building Loss:** | | |
|     Amount of Loss: | $633,916.27 | |
|     Policy Limit | | $475,000.00 |
| **Business Personal Property** | | |
|     Amount of Loss: | $300,077.93 | |
|     Policy Limit | | $280,000.00 |
| **EDP (Data Processing Equipment)** | | |
|     Amount of Loss: | $43,112.87 | |
|     Amt. (claim) | | $43,112.87 |
| **Business Interruption/Extra Expense** | | |
|     Amount of Loss: | $527,365.00 | |
|     Policy Limit | | $225,000.00 |
| **Total Limits** | | **$1,067,908.61** |
| **Total (Whole Loss-Building/Demo)** | **$1,549,267.81** | |

I have also relied on my conversations with counsel for DavCo.

    **2.4    How is the deductible under the Endorsement, and under the Policy applied to the Loss and does the Statement of Loss Prepared by Gene Adami reflect the proper application of the (a) deductible; and (b) annual aggregate retention?**

Policy number LHD349059 issued effective 10/1/06 to 10/1/07 contains an endorsement designed to explain and impact the application of the deductible and to establish or explain the application of the annual aggregate retention.

This endorsement is entitled "No. 1" which is a Landmark American Insurance Company (which is part of the RSUI Group) manuscript endorsement rather than an ISO (Insurance Services Office) endorsement. It should be kept in mind that

5

this endorsement is not a standard industry endorsement, rather it is an endorsement written by the RSUI itself. It should therefore be read to express the clear intent of RSUI and any ambiguity created by its terms should be construed in favor of the Named Insured, DavCo Restaurants, Inc.

Interestingly, while most endorsements designed to amend policy provisions state that they replace the section of the policy to be amended or changed; this endorsement does not replace the deductible section of the policy. Therefore both the endorsement and the deductible section of the policy must be read to establish how the deductible and retention should be applied.

The endorsement is somewhat vague, hard to follow and ambiguous but it outlines a $25,000 per occurrence deductible. It also outlines a $290,000 annual aggregate retention.

I understand from my review of the materials listed above and my discussion with DavCo's counsel, that there were no other claims during the 10/1/06 to 10/1/07 policy period, prior to this fire, which would have eroded the annual aggregate retention. Therefore the entire annual aggregate retention would need to be satisfied by being subtracted from the total loss sustained from this fire, prior to RSUI having any obligation for payment under the policy.

A retention is different from a deductible and therefore the use of both terms in the endorsement can be confusing to the average lay person. While a deductible is an amount subtracted from a particular loss or claim, a retention is the total amount of loss or damage which an insured agrees to absorb prior to any insurance carrier involvement or obligation. The term retention is normally used in the liability insurance domain and is less common in a property insurance setting. This is a subtle difference but one that adds to the ambiguity of the endorsement. An annual aggregate retention is the total amount of damage the insured agrees to absorb for a one year period. The policy in question therefore would not pay any claim until the insured satisfies the $290,000 annual aggregate retention.

RSUI made it very difficult for DavCo to erode the annual retention as the form indicates that a claim has to exceed $25,000 before the loss is applied toward the retention. Therefore DavCo could theoretically sustained 20 losses of $24,999 and never erode the annual retention. The vast majority of all property losses are fairly small and therefore it would be very hard for any insured to erode the annual aggregate retention of this policy.

Once a loss reaches $25,000 the entire loss, **including the first $25,000 of that loss**, erodes the annual aggregate retention. Therefore in this case, once the claim reached $25,001, the entire loss amount began to erode the retention. The first $290,000 of the loss satisfied the retention as well as the deductible. Keep in mind that these are two completely different issues. A $25,000 deductible is applied to the loss, however that same $25,000 should be absorbed into satisfying the

6

retention as endorsement "No. 1" states; "those losses in excess of the qualifying deductible ($25,000) will apply to erode the **annual aggregate deductible at 100% of the loss amount**". This is certainly an ambiguity in the endorsement as **there is** no annual aggregate **deductible** in the policy, rather there is an annual aggregate **retention**. My reading of this endorsement is that they meant to say retention rather than deductible. The entire **"100% of the loss amount"** would erode the retention including the first $25,000 of the loss which was subtracted as a deductible.

Clearly the adjuster should not have deducted $25,000 as a deductible and then taken another $290,000 as the retention. He should have applied the $25,000 deductible to the total loss amount, given credit for the deductible towards satisfying the retention and then deduct an additional $265,000 from the remaining loss to satisfy both the deductible issue and the retention issue. As a practical matter, his mistake didn't effect his bottom line number due to the fact the after deducting both the $25,000 and the $290,000 from the total loss amount, the remaining claim was still greater than the policy limit.

The policy clearly defines how the deductible is to be applied on page 8 of 14 on form CP 00 10 04 02 in section D. entitled, "Deductible". This section outlines that **"In any one occurrence of loss or damage (herein-after referred to as loss)"**... **"if the adjusted (for coinsurance – not applicable here) amount of the loss exceeds the deductible, we will then subtract the Deductible from the adjusted amount of the loss, and will pay the resulting amount or the limit of Insurance, whichever is less."**

In this claim RSUI's position has been that they are entitled to subtract the deductible and the retention from the policy limit rather than from the loss. Clearly this is not what the policy intends. From the above quote, the policy clearly states that the deductible is to be deducted from the loss, not the limit. Endorsement "No. 1" states, as noted above "those losses in excess of the qualifying deductible ($25,000) will apply to erode the annual aggregate deductible **at 100% of the loss amount**". This provision indicates that just like the deductible, the retention is deducted from the loss amount, not the limit. There is no indication of any kind in the policy that would lead one to interpret the policy to say that these amounts should be deducted from the policy limit rather than the loss amount.

In fact, the examples outlined in the policy with regard to the application of the deductible confirm that if the loss is in excess of the deductible, the deductible is subtracted from the loss, not the limit of the policy. In the policy examples and in common usage and custom in the industry, as long as the loss is in excess of the limit plus the deductible, the policy pays the limit of insurance. Likewise, the phrase "those losses in excess of the qualifying deductible" refers to the fact that once a loss exceeds $25,000 the loss qualifies to erode the retention. The entire loss, not just the amount in excess of $25,000, applies to erode the retention. The phrase, "in excess of " does not mean that only the amount in excess of the

7

deductible applies to the erode the retention, that phrase only serves to clarify that only losses in excess of $25,000 apply to erode the retention. The endorsement goes on to explain that the entire loss, **"100% of the loss"**, applies to erode the retention. That means that the first $290,000 of this claim erodes the retention. The first $290,000 includes the $25,000 deductible as the endorsement states "100% of the loss". As stated above, the retention is a separate issue from the deductible and these items must be addressed individually. Therefore in the claim at issue, as long as the policy limit plus the $290,000 retention is less than the total loss sustained, the policy limit must be paid.

The parties to this lawsuit have apparently agreed that the loss amount is $1,549,267.81. Therefore the deductible and retention should be applied as follows:

| | |
|---|---|
| **Total loss sustained from above** | **$1,549,267.81** |
| **Adjusted amount of loss (no coinsurance)** | **$1,549,267.81** |
| **Less deductible** | **$25,000.00** |
| **Less remaining annual aggregate Retention** | **($265,000.00)** |
| **Net Claim** | **$1,259,267.81** |

Per the terms of the deductible provision, since the total loss sustained less the annual aggregate retention is greater than the policy limit, the amount payable under the policy is the policy limit or **$1,067,908.61**. Recall the policy states "**if the adjusted amount of the loss exceeds the deductible, we will then subtract the deductible from the adjusted amount of the loss, and will pay the resulting amount or the limit of Insurance, whichever is less.**"

Clearly the reference to "the adjusted amount of loss" refers to the amount of loss after any adjustment for any coinsurance penalty or valued policy consideration. The loss in this claim does not require such an adjustment as the policy indicates on the declaration page that the coinsurance percentage is "NIL". Therefore in this claim, "the adjusted amount of loss" is the same as the total loss amount or **$1,549,267.81**.

The result is that the limit of insurance (**$1,067,908.61**) is less than the resulting amount of loss, less the deductible and retention or **$1,259,267.81** and as outlined in the policy (and above) RSUI owes the lessor of these two amounts which is the policy limit or **$1,067,908.61**.

To drive the point home, one can look at it from this perspective. If RSUI is correct in the way they are applying the deductible and the retention (subtracting it from the policy limit), how could the loss ever be greater than the policy limit and why would the phrase "**and will pay the resulting amount or the limit of Insurance, whichever is less.**" need to be included in the policy? A claim greater than the policy limit could never occur if the deductible and retention are to be deducted from the policy limit.

8

**2.5  Is the deductible applied to the loss, the claim or something else?**

The deductible is to be applied to the total loss sustained (**$1,549,267.81**).

**2.6  May the Insurer under this policy apply the annual aggregate Retention and the deductible to the various items of covered property in a manner most beneficial to the Insurer to reduce the claim?**

In short; no. The policy is very specific with regard to the application of the deductible and the retention as explained in 2.4 above. Both items should be applied to the total loss sustained and only one deductible may be applied. Once taken, the deductible is to be applied to the annual aggregate retention (subtracted from) prior to application of the remaining annual aggregate retention ($265,000) to the remaining loss sustained ($1,524,267.81).

RSUI argues that they are entitled to apply the deductible to any coverage they choose and wish to apply it in the manner most favorable to RSUI, however common usage and custom in the industry prescribes that when there is an ambiguity in the policy, where the policy is not clear or where an interpretation of a policy provision can result in two different outcomes, the application most favorable to the insured should be applied. Since the endorsement in question was drafted by RSUI, the insured should get the benefit of any ambiguity. Where application of any policy provision has more than possible outcome, assuming the outcome does not lead to an absurd or strained result, the provision should be applied in the manner most favorable to the insured.

Likewise a deductible is different from a retention and these terms need to be considered separately in this claim scenario. While the RSUI endorsement creates some confusion by inter-mingling the use of the terms deductible and retention, (Example: "No losses under the deductible will erode the **annual aggregate deductible.**" "will apply to erode the **annual aggregate deductible** at 100% of the loss amount.") the reader should not be confused by the two terms.

With regard to the retention: Endorsement #1 clearly states that a qualifying loss "**will** apply to **erode the annual aggregate** deductible **at 100% of the loss amount.**" Therefore this provision states that the retention is to be applied to the total loss sustained, not the policy limit. The total loss sustained in this claim is **$1,549,267.81** and the $290,000 retention should be subtracted from that amount, leaving $1,259,267.81. The retention actually represents the first $290,000 of the loss sustained. Once the retention is satisfied, the policy becomes obligated to pay the remaining loss up to the policy limits.

9

With regard to the deductible: The policy clearly states that the deductible is to be subtracted from the adjusted amount of loss (the **adjusted amount of the loss** means the amount remaining after any adjustment for any coinsurance penalty or valued policy issue, **which is not applicable to this claim**). Therefore to paraphrase this provision as it applies to this claim, the deductible is to be subtracted from the amount of the actual loss sustained. The policy does say that the losses will not be combined in determining the application of the deductible; however it does not say the RSUI can apply the deductible in the way that is most favorable to RSUI. In this claim the deductible:

1. Should be applied towards the Building loss, which far exceeds the building limit, to give the insured the most favorable application.

**2.** Should be absorbed into the application of the annual aggregate retention, both of which should be deducted from the actual loss sustained, not the policy limits.

RSUI, in addition to applying the deductible in the manner most favorable to RSUI, also attempts to double dip by applying both the entire $290,000 retention and the $25,000 deductible to the claim by subtracting $315,000 from the policy limits. The total amount deducted from the actual loss sustained should be $290,000, not $315,000. The $25,000 deductible is part of the retention, not in addition to the retention. The $290,000 should be deducted from the actual loss sustained, not the policy limits. RSUI is inappropriately attempting to avoid paying $315,000 to DavCo by improperly applying the deductible and the retention to this claim.

### Is the annual aggregate retention a deductible or is it something else, or can you tell under this policy

The annual aggregate retention is not a deductible. While it is not a defined term under the policy, the common usage of the term in the industry is that a retention is the self insured amount of a claim. A retention is commonly referred to as a self insured retention. There exists an understanding that in exchange for a reduction in premium, the Named Insured will absorb, or be self insured, for the first X number of dollars of any loss amount. An annual aggregate retention therefore is an agreement that the Named Insured will self insure for the first X dollars (in this case $290,000) of all losses incurred over a one year period. With this particular retention RSUI adds an interesting twist in that only claims exceeding $25,000 count towards erosion of this annual aggregate retention.

While retentions and deductibles are similar, they are not the same. Obviously the use of the term retention was deliberate in this policy as it enabled the drafter to express his or her intent in a situation where the annual aggregate retention was

satisfied, a "maintenance deductible" could still be assessed against any claim incurred post satisfaction. Here the terms deductible and retention are used to create a distinction between deductibles and the annual aggregate retention.

### 2.7 Have your opinions undergone peer review and if so how?

My findings have been peered reviewed by a well qualified insurance expert with more than 30 years of practical claim handling experience. I also researched IRMI, Sage, Silver Plume and referenced numerous property insurance related texts for additional insight with regard to retentions in a first party property setting as well as deductible application.

FC&S published a bulletin dated 02/01/09 (attached) that gives examples of how the deductible should be applied in various claim scenarios when dealing with form CP 00 10 04 02 and all CP 00 10 editions issued after the 1991 form change. That bulletin states:

"Changes made in the 1991 edition of CP 00 10 clarify that loss payment calculations must first take into account any coinsurance penalty or deductions for the agreed value option. The form provides two examples illustrating application of the deductible when there is more than one limit of insurance. The deductible is added to the limit of insurance. If the amount of loss is less than this sum, then the deductible is subtracted from the amount of loss to obtain loss settlement. **If the amount of loss is greater than the sum, the amount paid is the limit of insurance.**"

### 2.8 Is there a difference between a deductible and an "annual aggregate Retention" and if so what is it?

A deductible is an amount subtracted from a particular loss and is deducted from each and every loss incurred. If an insured has 20 losses, 20 deductibles would be applied, one to each claim. An annual aggregate retention on the other hand is the amount of loss that must be retained by the Named Insured prior to the insurance company having any obligation to pay claims under the policy and is made up of all qualifying deductibles plus amounts of qualifying losses in excess of the deductibles. Once these sums reach the annual aggregate retention amount, the retention is deemed satisfied and all losses are paid subject to any maintenance deductible per claim. Only one deductible may be taken per claim. Once the annual aggregate retention is met, the insurance company has an obligation to pay all covered losses in excess of any deductible up to the policy limit. The retention can be satisfied by multiple qualifying losses or just one large qualifying event as we have here.

*Basis and Reasons for Opinions*: The basis and reasons for the above opinions are as set forth in the above statement.

**2.9   Provide the** *Data and Other Information Considered in Forming the opinions*"

My opinions are based upon my experience, my knowledge of the industry, my review of the forms, backup attached to the claim and my review of other documents identified herein as well research through IRMI, Sage, Silver Plume, industry text books and FC&S bulletins. My opinions have also been subject to peer review by a qualified expert in the industry.

**2.10   Please provide a statement of your compensation and expert testimony in the last 4 years and articles written in the last 10 years.**

**Compensation**: As set forth in my deposition.

Prior testimony or activity in past 4 years as a consultant or expert:

Southgate v MAPP Construction - Nineteenth Judicial District Court, East Baton Rouge Parish, Louisiana, Case No. 69-110-J-009929-06 docketed as Case Nos. 529,351 and 550,534. Defense consultant.

Loyola University v MAPP Construction Suit No. 04-1314, Div. C; Civil District Court Parish of Orleans. Defense consultant

Fuselier v Diamond B – wrongful death case settled pre-suit. For the defense

Atlantic Recycling and Tiger Fibres LLC v Aspen Specialty Ins. Co. No. 1:07cv1106, 2008 WL 3849367 (E.D. Va. Aug. 15, 2008). Plaintiff's expert.

The State of Louisiana v Arrighi Simoneaux, LLC (Bogue Chitto State Park). Defense Consultant.

Securtec, Inc. v State of Louisiana, Division of Administration; 536, 651, 19th JDC, Div. "D". Defense consultant.

Petro Log v Evanston – Albert Dominick Capozzi v Atwood Oceanics, Inc. et. al. United District Court for the Western District of Louisiana, Civil Action No. 6:08-cv-00776. Plaintiff's consultant.

Kenneth Whittington, et. al. v PCS Fertilizer & Christopher Hall, et. al. v PCS Nitrogen Fertilizer, et. al. 23rd Judicial District Court For the Parish of Ascension State of Louisiana NO. 85-261 & NO. 85,322 DIVISION "E" & "A" respectively. Defense consultant.

12

I do not believe I have testified in any other cases. If I discover any other cases I will provide the information. Likewise, the above information is the best information that I have concerning the cases in which I provided testimony. If I am better able to identify a case or court I will do so. Further, I have not published any articles in the last 10 years.

My compensation is based on an hourly rate. My hourly compensation is $200 per hour. I have worked on this case for approximately 30.9 hours to date on an hourly basis. I have been paid $1,200 for my time to date.

_7-28-09_  
Date

Lou Fey

ISO Commercial Property Program
February 2009
Summary:

| Deductible |
|---|

D. Deductible

In any one occurrence of loss or damage (hereinafter referred to as loss), we will first reduce the amount of loss if required by the Coinsurance Condition or the Agreed Value Optional Coverage. If the adjusted amount of loss is less than or equal to the Deductible, we will not pay for that loss. If the adjusted amount of loss exceeds the Deductible, we will then subtract the Deductible from the adjusted amount of loss, and will pay the resulting amount or the Limit of Insurance, whichever is less.

When the occurrence involves loss to more than one item of Covered Property and separate Limits of Insurance apply, the losses will not be combined in determining application of the Deductible. But the Deductible will be applied only once per occurrence.

EXAMPLE #1:
(This example assumes there is no coinsurance penalty.)
    Deductible:$ 250
    Limit of Insurance - Building #1: $60,000
    Limit of Insurance - Building #2:$80,000
    Loss to Building #1:$60,100
    Loss to Building #2:$90,000

The amount of loss to Building #1 ($60,100) is less than the sum ($60,250) of the Limit of Insurance applicable to Building #1 plus the Deductible.

The Deductible will be subtracted from the amount of loss in calculating the loss payable for Building #1:
    $60,100

    -250
    ―――――
    $59,850 Loss Payable – Building #1

The Deductible applies once per occurrence and therefore is not subtracted in determining the amount of loss payable for Building #2. Loss payable for Building #2 is the Limit of Insurance of $80,000.
Total amount of loss payable: $59,850 + 80,000 = $139,850

EXAMPLE #2:
(This example, too, assumes there is no coinsurance penalty.)
The Deductible and Limits of Insurance are the same as those in EXAMPLE #1.
    Loss to Building #1: $70,000 (exceeds Limit of Insurance plus Deductible)
    Loss to Building #2: $90,000 (exceeds Limit of Insurance plus Deductible)
    Loss Payable - Building #1: $60,000 (Limit of Insurance)
    Loss Payable - Building #2: $80,000 (Limit of Insurance)
    Total amount of loss payable: $140,000

*Analysis*
The standard deductible applying to all perils except earthquake is $250 and is employed only once per occurrence. The rules permit the purchase of insurance with higher deductible amounts. The rules allow for application of the optional deductibles on a per location basis, with different deductibles permitted for different locations. All property at one location is subject to the same deductible, even if divided between blanket coverage and specific limits, except that different deductible amounts may be provided at each location for windstorm-hail or theft through endorsement CP 03 20 10 92. Formerly, deductibles—even at one location—could vary by cause of loss. For purposes of instituting the higher deductible amount, the 80 percent coinsurance requirement was eliminated by the 1990 changes on CP 00 10; minimum coinsurance requirements are determined by rules for the causes of loss forms and other individual rules that may apply. Where one occurrence causes loss at different insured locations, only the largest applicable deductible is used to reduce the insured's recovery. Changes made in the 1991 edition of CP 00 10 clarify that loss payment calculations must first take into account any coinsurance penalty or deductions for the agreed value option.

The form provides two examples illustrating application of the deductible when there is more than one limit of insurance. The deductible is added to the limit of insurance. If the amount of loss is less than this sum, then the deductible is subtracted from the amount of loss to obtain loss settlement. If the amount of loss is greater than the sum, the amount paid is the limit of insurance.